We're now ready for Davis v. Carpenter, 17-6225. Good morning, Your Honors. May it please the Court. I'm Michael Lieberman, and along with my co-counsel Tom Hurd from the Oklahoma Capitol Habeas Unit, we're here on behalf of Appellant Nicholas Davis. Your Honors, when you review the record in this case, there should be nothing in this record that gives you any confidence at all in the outcome of the trial. From beginning to end, trial and appellate counsel failed Mr. Davis. I think to put the argument in context, I want to start with a quote from this Court in Anderson v. Sermons, which is cited in the briefing, but it's 476 F. 3rd at 1131. I'm quoting from page 1143, where this Court said, Cognizant of the overwhelming importance of the role mitigation evidence plays in the just imposition of the death penalty, this Court agrees with the District Court and concludes trial counsel's failure to investigate and discover readily available mitigation evidence amounted to constitutionally deficient performance. That's what we have here. From the very beginning of the case, trial counsel should have known there were red flags abundantly about Mr. Davis' mental health problems. Almost immediately upon getting appointed to the case, original trial counsel sent Dr. Max Edgar to the Oklahoma County Jail. Dr. Edgar is an employee of the Oklahoma County Public Defender's Office, and as was later testified to in the evidentiary hearing by trial counsel, the office in every capital case sent Dr. Edgar over to the jail to check in on the client, quote unquote, and do a preliminary gatekeeping function on what issues the client presented. Dr. Edgar's report, which was attached to the habeas petition as attachment 4, but it was also one of the exhibits in the evidentiary hearing, so it's in the state court record as well, Dr. Edgar says that Mr. Davis is, quote, paranoid, that he was hearing command auditory hallucinations during the crime, that he suffers from delusional thinking, major depression, and had previous suicide attempts. He also says that he's likely low average to average IQ, with learning disabilities, chronic serious major depression with periodic psychotic episodes, and chronic auditory hallucinations. That trial counsel clearly put enough weight on Dr. Edgar's screening interview that they filed a competency motion to have Mr. Davis evaluated for competency. Yet they did none of their own follow-up testing, they didn't hire a psychologist, they didn't hire a psychiatrist at that point to do any testing. But as a result of the competency motion, Dr. Peter Rausch then comes into the picture. His report is also part of the record. He was employed by the state forensic hospital, so he's not a defense expert. He spent an hour and a half at the Oklahoma County Jail with Mr. Davis, that was it. But even in that hour and a half, he was able to recognize, first of all, that Mr. Davis was heavily medicated, that at the time he was on Seroquel, Prozac, and Trazodone. So as the court knows, Seroquel is a pretty hardcore anti-psychotic, so if the jail had Mr. Davis on Seroquel, obviously there are issues. And what Dr. Rausch determined at the time was that Mr. Davis wasn't exhibiting any psychiatric symptoms. He didn't say he didn't have any psychiatric problems. He recognized the previous diagnoses of major depression, paranoia, and hallucinations, but determined that when medicated, he wasn't exhibiting symptoms. Then Kathy Hammerstein comes in the picture, who's the attorney who wound up taking the case to trial, and is the one who our ineffective assistance of trial counsel claim is primarily directed against. One of the first things she did upon getting in the case was withdrew the competency motion and waived the competency jury trial. Just put an end to any mental health investigation, or evaluations anyway, let me be clear, that were done. We later find out by a memo to the file that was originally submitted under seal during the evidentiary hearing, but was subsequently unsealed as a result of the habeas petition, that Ms. Hammerstein apparently had a phone conversation with a Dr. Therese Hall. There's nothing in the record from Therese Hall. There's no report. There's no testing. There's no evaluation by Therese Hall, but there is a memo that Ms. Hammerstein wrote to the file. It's dated January 2nd of 2007. I say it's dated that because we don't really have any way of knowing for sure when it was never asked Ms. Hammerstein about it. The state didn't know about it at that time, so they obviously didn't ask her. What's significant about that memo, and a lot of weight was put on that memo, I think, by the district court and by the attorney general's office, as showing the strategy for not pursuing mental health. Let's examine that memo carefully. First of all, it's not a direct conversation, if we take what the memo says is accurate. It's a voicemail that Ms. Hammerstein received from Dr. Hall after the holidays. The memo says that Dr. Hall had, quote, ceased work on Nick's case because she does not believe she can be of any assistance to us. The next paragraph, the second paragraph in the memo, I think, is critical. She sets out what it was that Dr. Hall did. Dr. Hall saw Mr. Davis at the county jail for several hours. We don't know how many hours that is. This is the important part. After reviewing our reports of interviews with family members. Now let's examine that for a second. So it's defense counsel, defense investigator interviews with the family. So first of all, what sticks out about that, we know that Dr. Hall didn't review Dr. Edgar's report because the memo doesn't say so. Didn't have Dr. Rausch's report because the memo doesn't say so. What she had was interviews with family members. Now we also know from the evidentiary hearing that the family members that trial counsel had had interviewed by that point were the family members that gave the inaccurate depiction of what Mr. Davis's childhood was like. There were the family members that painted the idyllic picture of a great childhood on the farm with abundant animals to eat and vegetables everywhere. And we know from the subsequent testimony that Ms. Hammerstein or no other trial counsel had talked to the witnesses that would have given the other side of that story. So what Dr. Hall had to rely on was inaccurate, certainly incomplete because it didn't have any of the mental health information. And apparently Ms. Hammerstein wasn't even concerned enough to call Dr. Hall back and ask her any of those questions because her memo is based entirely on the voicemail. I take that back. She does say she spoke to her. We don't know exactly what they spoke about. We don't know but that. The rest of what I said I stick with. She didn't have the testing. She had the inaccurate memos. I apologize about that misstatement, your honors. Based solely on this and Dr. Hall's off-the-cuff. Well, that wasn't off-the-cuff. She spent several hours with him. She reviewed the information that she had. I mean, that's not off-the-cuff. That's not a drive-by. I forget what you call it in your brief. I would submit, your honor, from Ms. Hammerstein's standpoint, it is drive-by. It is off-the-cuff. Well, let me put it a different way. Ultimately, you've got to tell us, you've got to convince us that the OCCA, which said this was reasonable for trial counsel to rely on this experienced expert who had testified or apparently been an expert in multiple capital cases and who had spent several hours with this defendant, that it was reasonable to rely on this, for trial counsel to rely on this. We've got to say that no fair-minded jurist could have found that that was reasonable. How do we get there? Let's focus on that. And that's exactly why I started with the quote from Anderson. From Anderson, yeah. Because this is heightened scrutiny in death penalty cases. Mental health is the gold star mitigation evidence. Ms. Hammerstein herself testified at the evidentiary hearing that, quote, there is always a reason why these clients do these things and that she investigates mental health in every case. Now, in this case, one of the early things she did was derail the competency hearing. And from this memo, we know that Ms. Hammerstein had no reason to believe that Dr. Hall did any testing, did any evaluation, and was basing her opinion on reports of interviews that it turned out were not accurate. And her own interview with her. And her own interview. Right, for several hours. So can you get back to Anderson and the case law that you would say supports your argument that this was somehow unreasonable, that no reasonable jurist would have made this finding? I will. And in addition to Anderson, I would rely on Ms. Court's opinion in Hooper, which we also cite. And Hooper was, I would submit, a very analogous case where trial counsel, again, had a very abbreviated, very incomplete expert opinion and made the intentional decision, some would say strategic, to not follow that up with any further testing. Because, and I'm quoting from this court's opinion at page 1170 in Hooper, Mr. Lee claimed he feared the result of such an evaluation would be more harmful than helpful because a more comprehensive examination might establish conclusively that Petitioner did not suffer from brain damage. That's precisely what OCA found that Ms. Hammerstein did in this case. The Hooper case, though, I mean, I don't know how you compare that. I guess that's the case where the expert's report actually recommended further testing and said there could be organic brain damage. Counsel then made the intentional choice to proceed with sort of this half-baked argument, knowing that the expert had recommended further testing and knowing that it wasn't a certain diagnosis. We don't have that here. We have this expert apparently saying, you know, after her time and her review of what she had, that this man was psychotic. And I don't see that the same, you know. Certainly did not recommend further testing and, in fact, seemed to recommend against it. So how is counsel then similar in this case when she proceeds with this information? Well, a lot was made by OCA about how experienced Ms. Hammerstein was in capital cases. I believe the state refers to her as one of the top five capital litigators in Oklahoma. Clearly, any competent capital litigator, even back at that time, would know, first of all, that antisocial personality disorder, which is what Dr. Hall opined about based on no forensic evidence anyway, that that's a rule-out diagnosis. That should not be the end-all, be-all. That's not enough to scare you away from representing your client zealously. We also know that post-traumatic stress disorder, which we now know, and the state court knew on post-conviction. Explain that. I thought Dr. Hall was pretty definitive, saying, I don't need to do any testing. This guy is so clearly psychotic, or whatever the term was. I think a psychopath. Psychopath. I misstated it. It's one of those really obvious cases. There's no reason to give a standardized test and things like that. Well, except we now know. Why do you say it's a, I'm sorry. We now know that that was wrong. Well, you now know that you have another expert who says to the contrary. But this is not, there are a couple factors in play here. If you have some confidence in Dr. Hall, I don't know why Dr. Hall was asked. Presumably Dr. Hall had been helpful to capital defendants in other cases. And you get that kind of diagnosis from Dr. Hall. Then, okay, I will go someplace else and try to find another psychologist or psychiatrist who will give me a more favorable diagnosis. You could say that, but then you realize, if I put on psychological testimony, they're going to be able to find someone just like Dr. Hall, and then I'm really screwed because that's going to be very harmful to my case. Why is it such a terrible strategic decision to say, you know what, I think this is not going to be the way we should put on our mitigation case? And even more so, that's what the OCCA said, and why is it unreasonable for a court to make that determination? And I don't want to quibble with Your Honor. No, please quibble. I don't want to be, let's get this right. I think to call what Dr. Hall did a quote-unquote diagnosis stretches it beyond its limits. She didn't, you can't, no self-respecting mental health expert would diagnose without testing. It's like if you went to the doctor and the doctor says, I don't have to do any testing, I can tell you're the kind of person that probably has diabetes. That's not what experts do. She met with Mr. Davis, for all we know, on one occasion. Maybe Mr. Davis was having a bad day that day. Let me pursue your quibble a little bit. What did Dr. Hall say? Did not, am I misrecalling that Dr. Hall said there's no need to do any testing? This is a very obvious diagnosis? That is what she said. The attorney is supposed to say, I know this field better than my expert, so I'm not going to believe her, and I should go ahead and have it tested anyway, or I should try to get another expert even though I know that there's a decent chance that I'm going to be pummeled at trial by someone who takes the same view as Dr. Hall. Is that what you're saying an attorney's duty is? I think in this unique circumstance where the attorney knows, first of all, the attorney knew several things. The attorney presumably knew about Dr. Edgar's conclusions and knew that Dr. Hall did not know about those conclusions. So the attorney knew that Dr. Hall's opinion was based on inaccurate information. We don't know what the later conversation was between counsel and Dr. Hall. Well, we have the memo. We just have the memo, and then there was a conversation. Does the memo refer to the conversation? It does, and I misspoke when I said that earlier, and I apologize for that. And counsel and Dr. Hall were not deposed, they were not questioned, there's no affidavit, no interview of them regarding more about what they discussed? No, and that's part of our appellate IAC. That's because of the ineffectiveness of counsel at the state level, Your Honor. That's correct. Okay. So to get back to our mutual quibble, this isn't a case where we're necessarily claiming that Dr. Hall was ineffective. There's no ineffectiveness of expert. It's trial counsel. If it's true, as OCA found, that this is one of the most experienced capital litigators in Oklahoma, then OCA also should have known that as a successful or experienced capital litigator, trial counsel should have known that especially when you have the conclusions of Dr. Edgar, and now this doctor comes in without that information, that you can't rely on that opinion of the expert to cease doing any investigation of mental health. And in response to sort of the double-edged part of this, most of the bad stuff other than the ASPD label wound up coming in anyway. The jury knew about Mr. Davis' past or the bad part because that all came in as part of aggravation. What they didn't know was that he might have had an explanation for this and that it might have been something other than him just being mean and just being an evil person. Let me back up a moment. Do we know that appellate counsel didn't interview Dr. Hall or trial counsel about the conversation they had, or do we just know that they didn't put anything on the record? What we know about appellate counsel is this, and I'm trying to respond to Your Honor's question, but I want to put some meat on the bones. Original appellate counsel was a woman named Kim Bays, and we know in the original direct appeal brief and the 311 motion that eventually got the evidentiary hearing, we know that Ms. Bays was at least on the right track because she talked about Mr. Davis' mental health issues. She cited a number of cases talking about battered woman syndrome and the battered woman defense, which I would say, although doesn't use the term post-traumatic stress disorder, it's PTSD. So we know that she was going in the right direction. We also know, and I want to be very careful what I say here because the record is not very complete on this, but we know that after the evidentiary hearing was granted, Ms. Bays was removed from the case and stopped working at the office. We don't know. The record doesn't say why, but we know that she then left. And Andrea Miller then came in, and we know what OCA understood the claim to be because in their order granting the evidentiary hearing and remanding, this is at page two of that order, and this is how OCA describes the inquiry. Appellant seeks an evidentiary hearing on his claims of ineffective assistance of counsel in the first stage of trial for failing to have a qualified expert evaluate him and offer a counter-opinion to the state's theory that he killed the decedent with malice aforethought. Appellant asserts that with an expert witness, he could have shown that due to his distrust of others, he felt truly threatened by the decedent's presence and behavior towards him. So we know they thought it was a first-stage claim. And then they say appellant asserts that in the second stage of trial, the qualified expert witness could have testified as to how appellant's childhood deprivation resulted in a heightened sense of danger and would have presented a cohesive and more compelling mitigation case. So again, they're not using the term post-traumatic stress disorder, but it's what they're talking about. It's clear that's what they understood the claim to be. Now we get to the evidentiary hearing. Ms. Bays is gone. Ms. Miller, just like at trial when things seem to be going along, Ms. Hammerstein comes along and completely cuts off any mental health investigation. Ms. Miller now comes in, and during the evidentiary hearing, she affirmatively tells the district court judge, the trial judge, that not that we're abandoning our mental health claim. She says, we've never raised a mental health claim. That's not true. That's not accurate, because they did raise a mental health claim, and OCA knew it in the remand order. And that's when this memo from Dr. Hall comes up. So what we know is appellate counsel, at least the subsequent appellate counsel, was trying to run away from any mental health issue. And do we know on what information counsel is doing that? Do we know that counsel had not pursued matters with Dr. Hall, talked to trial counsel, and decided, boy, we're just going to stay away from that? Or is it what you seem to presume, contrary to the presumption of effective assistance, that counsel just dropped the ball and didn't pursue that? Do we know one way or the other? All we know about that is that came up during an ex parte conference with the trial judge in which appellate counsel gave the trial court a copy of this memo that we've been talking about. So you don't know, so you do not have any evidence one way or the other about whether appellate counsel pursued what happened in the conversation between Hall and the trial counsel? Again. If that's the case, doesn't that hurt you a lot? Because there's a presumption of effective assistance, and you have the burden of showing what wasn't done? Am I wrong about that? Well, I mean, you're right about what the cases say, but the problem in a case like this is we're alleging that appellate counsel was ineffective, and the only person we could get that information from would be appellate counsel. Or Dr. Hall. Well, we could get from Dr. Hall if there were subsequent contact. We couldn't get from Dr. Hall what impact that had on direct appeal counsel. If there were any, well, not only later contact, but also what was discussed, whether trial counsel said, well, would your opinion change if I read you the following excerpts from what the prior psychologist had said? We don't know that. We don't know that, but what we do know is in post-conviction, when the case was finally out of the Oklahoma County Public Defender's Office to truly independent counsel at OIDS, we know that they went to another actually qualified expert in Laura Duke, because the only expert appellate counsel presented was a licensed clinical social worker who was not asked to diagnose, but was simply asked to do a life social history. But when post-conviction counsel got in, they went to Dr. Duke, Laura Duke, and Dr. Duke submitted an affidavit saying he's got post-traumatic stress disorder. So we now have both opinions. So at the time OCHR ruled on post-conviction, they knew that Laura Duke disagreed with who had done testing and had done what experts are supposed to do at a different opinion. And I would submit at that point reasonable counsel, and I would hope reasonable jurists would put more weight on the expert opinion that was done after testing, rather than what we refer to as a flyby. I see that I only have about three minutes left, and I would like to reserve that for rebuttal. Thank you. May it please the Court. Caroline Hunt from the Oklahoma Attorney General's Office on behalf of Respondent. I'd like to start where opposing counsel spent a lot of his time this morning, and that's on the Dr. Hall memo to the file. The question as to this issue that it comes down to is whether a fair-minded jurist could agree with the Court of Criminal Appeals that trial counsel, Catherine Hammerston, at that point reasonably decided to terminate her investigation into potential mental health issues. And there are a number of reasons that a fair-minded jurist could agree. First, while Dr. Hall did not administer formal testing, she did note that Petitioner scored high on the hair psychopathy checklist. And so that indicates, at the very least, that over the several hours that Dr. Hall was meeting with Petitioner, she was keeping track of and scoring that checklist in her head. And several hours with him is on par with post-conviction expert Dr. Duke, who states that she spent five hours with Petitioner. Dr. Hall also noted that she had reviewed records of information obtained from Petitioner's family. Opposing counsel argued this morning that the family members provided an inaccurate picture of Petitioner's childhood, but, in fact, that was the claim raised on direct appeal, and it was thoroughly litigated and rejected by the Court of Criminal Appeals. They provided a 42-paragraph discussion on that issue and found that while Petitioner himself and his uncooperative brother told one story, the rest of the family described life on the farm as being good. And so that is something that the Court of Criminal Appeals rejected, and so we can't assume that the information on which Dr. Hall relied was inaccurate. Furthermore, as this Court recognized in Delosier v. Sermons, counsel is not required to keep hiring experts until the most favorable one is found. And, relatedly, I would extrapolate on that, that counsel isn't required, after receiving an expert evaluation, to tell the expert to go back and do more evaluation until a more favorable result is discovered. Well, shouldn't counsel at least have said, how about we do some testing? How about we actually do some testing? And that seems to be what he's primarily suggesting here, is that no reasonable attorney would have accepted that in a voicemail without inquiring further and saying, well, have you done any testing? What is that exactly based on? I have a couple of responses, Your Honor. First, I think Petitioner conceded this, but it was not just over a voicemail. The way the memo reads is, it's dated January 2nd, and Katherine Hammerston wrote, This morning, Therese Hall and I spoke about Nick Davis. Therese called over the holiday and left a message that she had ceased works on Nick's case. So I think the most reasonable read of that is just that there had been a voicemail. So she left a message, right. Exactly, but then Ms. Hammerston called back. So they had a conversation. Yes. But there's no reflection in that memo of their conversation, is there, that she inquired about exactly what that was based on, whether, you know. I would agree. There's not anything memorializing how much she pushed back on that or whether she asked for testing. However, as this Court recently recognized in Postel, albeit in the intellectual disability context, while an attorney cannot abdicate all responsibility for handling scientific and technical evidence, once an expert is provided with the information necessary to test a defendant, it's within the bounds of professional competence to rely on expert advice. And here where Dr. Hall had been given reports on interviews with petitioner's family members and was provided access to him for several hours, it's reasonable at that point for counsel to rely on her assessment without pushing for further evaluation or testing. And I would say also that Ms. Hammerston had her own interactions with petitioner to rely on. And again, she's an extremely experienced capital defense attorney. And I would direct this Court to States Exhibit 30. This came out at the evidentiary hearing on direct appeals, so it was before the Court of Criminal Appeals when it decided this claim on post-conviction. And Katherine Hammerston is memorializing a visit she had with her investigator, Tony Williams, to petitioner in jail. And I would read to the Court her words. I spent... Exhibit 30. I'm sorry? Exhibit 30. Yes, Exhibit 30. Yeah, States Exhibit 30. I spent a great deal of time going over Dee's prison records from Texas as well as his arrest history, most of which involved guns, women victims, and fights with inmates. Dee adopted a hostile, snotty attitude and was dismissive of each incident. He repeatedly feigned that he did not know the man or woman who was the subject of the allegation. When it grew tiresome, I called him on the attitude. Tony, that's the investigator, echoed my assessment of Nick's behavior. Nick then settled down, though he was resistant to hearing accounts of events that differed from his own views. And so I would submit that it was no shock at all to Ms. Hammerston when Dr. Hall came to her and said that she believed the petitioner to be antisocial personality disordered. Well, even if you might excuse not doing further testing, shouldn't counsel have made sure that Dr. Hall was aware of the reports of prior psychologists regarding medication and things like that? Is there any evidence that Dr. Hall knew the medicine that he was taking? Sorry, Your Honor. I would say that's not in the memo, but to the extent the record is silent, that cuts in favor of the state under Bart V. Titlow, for example. And the reason this issue wasn't developed at the evidentiary hearing is because at that point the claim was not mental health. And so that's why we're limited in what we have to go on is this Dr. Hall memo, because on direct appeal the claim was about the failure to present Shalonda Mosley, the social history expert, and the failure to present petitioner's brother. And so to the extent prevailing professional norms required counsel to do something further as far as preparing the expert adequately, it must be presumed she did so. And the Supreme Court has repeatedly rejected the idea that there are bright-line rules in the Strickland context. And so there's simply nothing requiring an expert to require that particular psychological tests be performed or that the psychologists have particular information before a capital defense attorney can reasonably rely on an expert's assessment. And I would also like to address Petitioner's point about Dr. Edgar as far as his report that Petitioner reported hearing voices and having a blackout. The reason to me is obvious why counsel would not want to further develop a claim in that regard is because that is totally belied by Petitioner's police interview. Petitioner tells Dr. Edgar he was hearing voices to go inside and to shoot and then claims at the critical moment when the shootings happened he completely blacked out. That is not at all what he said to police. He had a vivid memory of the time leading up to the shootings, the shootings themselves, never made any mention of hearing voices. And so certainly trial counsel could know that it would be disastrous to try to present that as any kind of mental health claim in second stage because it was so thoroughly contradicted by Petitioner's police interview. And I would also like to say as far as the point of cutting off mental health investigation at the point at which Katherine Hammerstein received the ASPD diagnosis, as the court said in Richter, counsel is not required to pursue fruitless investigation, much less one that would be harmful to the defense. And also in Penholster the court said there comes a point when a defense attorney will reasonably decide that another strategy is in order, thus making particular investigations unnecessary. And that point had clearly come at this case at the time Katherine Hammerstein spoke with Dr. Hall. And I would like to address some of the other things that opposing counsel discussed this morning. I disagree with his reading of the record in several points. As far as the competency evaluation, it was clear based on Dr. Peter Rausch's report and Katherine Hammerstein's evidentiary hearing testimony that the real issue with Petitioner was a conflict with his prior counsel. He believed fervently that he had a viable self-defense claim. And counsel did not agree with that because it was foreclosed by Oklahoma law. And so he had expressed the desire to proceed pro se. And so that's really what triggered the competency evaluation there. And Dr. Peter Rausch reported that that was really the crux of his problem was just that he disagreed with counsel. And Katherine Hammerstein confirmed that in the evidentiary hearing that they got along better once she came on the case. And that's why they didn't proceed further with the competency evaluation. And I would also like to discuss, I've been focusing on the lack of deficient performance, but there's also a lack of prejudice in this case. Does our standard review the same for both issues? Yes, in the sense that they are both governed by the AEDPA. But did the OCCA address prejudice? Yes, they addressed both prongs, Your Honor. Yes, and there was a new argument raised as to, I believe it was as to first stage prejudice. And not only is that argument forfeited, but the Court of Criminal Appeals referred generally to prejudice. And at one point they said something along the lines of, in particular, second stage, there was no prejudice. But that reasonably could be read, they're just saying, in particular, that. Not to the exclusion of first stage, that we're not reaching first stage prejudice. And as far as the lack of prejudice, the facts of this case, even by Petitioner's own account, show that these shootings were driven by anger and not PTSD or other mental illness. Petitioner admitted in his interview, the police interview, that he arrived to Shanetta Hook's apartment that night with a loaded .32 semi-automatic handgun with another fully loaded clip in his pocket. And even crediting his claim that Tia Green called him that night and asked him to come over to discuss the lawsuit, the record shows that Petitioner had obtained the gun and gone over to his uncle's house to get help on jamming it before he ever received the first phone call from Tia Green that night, which was about 10.06 p.m., roughly an hour before the shooting. He admitted that upon knocking at the door, he heard a male voice. And so that raises the question why he did not just walk away at that point if he was so afraid and hyper-vigilant. The crime scene photos show that this was a door to an external breezeway. He's still outside at that point, just steps from a parking lot. He could have just left. And nothing in Dr. Duce's report explains why, if he had PTSD and is so afraid and living in this state of hyper-vigilance, he would have gone over there in the first place. He admits upon walking in, he had the gun in his hand. He admits that he recognized Market Smith as soon as he walked inside. He admitted that he called Tia Green sometime after the shooting and said it wasn't over. And in the 49-page transcript of Petitioner's police interview, he says once that he was scared. But the thing he says over and over again is that he's angry, betrayed, cheated on, played by Tia Green. He's mad at both her and her family, who he says she's turned against him. And Petitioner never makes any claim that he thought anyone in the apartment was armed. Afterward, he admits that he called his parents and said he'd killed someone or thought he'd killed someone. Never says anything about, I was frightened, I thought I was being ambushed. When he calls contacts in Texas to set up a place to come and hide out, again, he doesn't say it was ambushed and killed in self-defense. He lies and says, I'm just dying to visit you. And during the interview, he admits he never told those people he was staying with about the shooting. And furthermore, looking at the full evidence that was before the jury, there's overwhelming evidence to show that this was a crime committed with malice before thought and not as part of a PTSD-induced episode. Petitioner knocks on the door but doesn't answer when the occupants ask him who's there. And, in fact, he covers the peephole so Marcus Smith can't see who's outside. As soon as Mr. Smith cracked the door, Petitioner pushed his way in and locked the door behind him, which certainly doesn't suggest he was frightened if he locked himself inside. Petitioner was dressed in all black, wearing gloves and holding a gun at his side. He shot Mr. Smith three times, Miss Hooks three times, including one to two times while she was on the floor, and Miss Green twice. There were eight of ten shots fired hit their target. And so even assuming that Petitioner has PTSD that colored his perceptions at the time of the shooting, PTSD doesn't explain all of this evidence, which shows the malice before thought. And so this claim fails us to both first and second stage. And I'm sorry, I wanted to make one last point. Anderson, I would note, was decided on de novo review, and their petitioner was never evaluated by a mental health expert, and so the fair amount of juris standard didn't apply in this case as it does here. And, again, Hooper is also thoroughly distinguishable. The expert there specifically noted the need for further testing, and the presentation of the mitigation evidence was unprepared, uninformed, and disastrous. And to the extent here Petitioner is making other claims about trial counsel not being prepared, as I said before, that was thoroughly rejected by the Court of Criminal Appeals on direct appeal. And if this Court has any further questions, I would ask you to please affirm the denial of habeas relief. Thank you. Thank you, Counsel. Thank you, Your Honors. I want to respond briefly to a couple of points. On Judge Hart's, your question about the standard of review, here's what OCA said, and this is from pages 134 and 135 of their opinion, which is attached as attachment B to our opening brief. Additionally, we find appellant has failed to establish strickland prejudice by the admission of the evidence, and that's talking about the Sholanda Mosley mental health issue. And then the very next sentence is, the mitigation evidence presented at trial showed that appellant's mother physically and emotionally abandoned him during his, and then they go on talking about mitigation evidence. The very next paragraph says the mitigation case presented at trial was credible and well-developed. So there's no evidence that they're talking about first stage prejudice, certainly, even though they recognized in their remand order that that was part of the inquiry. So did they make a prejudice finding as to mitigation as to second stage? Probably so. But we would submit that not with regard to. So there would be deference for second stage prejudice, but not for first stage prejudice. Correct. And on that point, I know the court is aware of this, but I at least want to highlight the fact that we still have pending before the panel a motion to expand the Certificate of Appealability to include the jury instruction issue, which is the first stage issue, and PTSD certainly had that evidence been presented through effective attorneys, that would have changed the calculus for whether Mr. Davis was entitled to that instruction. So that's the first stage prejudice argument. And I guess I want to take issue with the state's discussion of Dr. Rausch's report. To be sure, Dr. Rausch does talk about the fact that Mr. Davis wasn't particularly happy with his counsel. But he also talks about the anti-psychotic medication he has him on, that the jail is treating him for psychiatric issues. So I guess that begs the question of why in the world would a jail be spending money to treat somebody for psychiatric conditions that the state now says he didn't have? Clearly he had them. Clearly that should have been investigated, and it was ineffective not to. So with that, we would urge the court to reverse and at a minimum order an evidentiary hearing on the claim. Thank you. Thank you, counsel. Thank you. Case is submitted. Counsel is excused, and the court is adjourned.